## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| PAM SMITH, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )     CAUSE NO.: 1:15-CV-10-TLS |
| | ) |
| NATIONWIDE AFFINITY INSURANCE | ) |
| COMPANY and PHH MORTGAGE | ) |
| CORPORTATION, d/b/a/ PHH MORTGAGE | ) |
| SERVICES, | ) |
| | ) |
|     Defendants. | ) |

## OPINION AND ORDER

On December 5, 2014, Plaintiff Pam Smith filed a Complaint [ECF No. 3] in Dekalb

Superior Court against Defendants Nationwide Affinity Insurance Company (Nationwide) and

PHH Mortgage Corporation (PHH), alleging breach of contract and bad faith. The Plaintiff also

sought declaratory judgment and injunctive relief against PHH. PHH removed the case to this

Court on January 12, 2015. On November 11, 2016, the Court granted the parties' joint

stipulation to dismiss PHH. [ECF No. 60]. This matter is now before the Court on Defendant

Nationwide's Motion for Partial Summary Judgment [ECF No. 31] as to the Plaintiff's bad faith

claim (Count II). For the reasons stated in this Opinion and Order, the Court finds that the

Defendant is entitled to summary judgment on Count II.

## BACKGROUND

The following facts are undisputed. Before and on April 4, 2014, the Plaintiff maintained

a homeowner's insurance policy [ECF No. 64-1] with Nationwide. The Policy excludes coverage

for "any loss arising out of any act an 'insured' commits or conspires to commit with the intent

to cause a loss." (Policy at 27, ECF No. 64-1.) The Policy also excludes coverage if an insured has "intentionally concealed or misrepresented any material fact or circumstance; engaged in fraudulent conduct; or made false statements" relating to the insurance. (*Id.* at 30–31.)

On April 4, 2014, a fire[1] occurred at the Plaintiff's house, located at 922 South Ijams Street in Garrett, Indiana. (*See* Fire Loss Documents, ECF No. 64-4.) At the time of the fire, the Plaintiff lived in the house with four of her children, including her 19-year old son, Austin Carroll, and her four dogs. (P. Smith Stmt. 3–4, ECF No. 64-16.) The day before the fire, the Plaintiff maintains that she took her younger children and their friends to the Children's Museum in Indianapolis on an overnight trip. (*Id.* at 18–19.) She also carried, in her purse, $5,000 in cash that she had previously received from Nationwide on a separate insurance claim. (P. Smith Second Stmt. 24–26, ECF No. 64-14.) Carroll, who remained at home alone, stated that he made dinner on the stove the night before the fire, went to bed, and awoke at around 1:00 AM due to black smoke in his bedroom. (A. Carroll Stmt. 3, 5; ECF No. 64-17.) Upon noticing the smoke, he maintains that he jumped out of his window, ran to the front of the house to get the dogs out, and called the fire department. (*Id.*) The same day, after learning about the fire from her son, the Plaintiff made a claim under the Policy. Also on the same day, Nationwide's claims adjuster met with the Plaintiff and advanced her money to cover her immediate expenses.

## A. Nationwide's Investigation of the Cause of the Fire

Nationwide's cause-and-origin investigator, Jim Hunter, was assigned to the case. Four days after the fire, he inspected the house, took photographs, reviewed the Garrett Volunteer Fire

---

[1] The parties contest whether there was the one fire, one fire with two points of origin, or two separate fires. The Court's analysis of whether there is truly a material factual dispute regarding the number of fires is a part of this Opinion and Order, but in general, for the purposes of this Order, the Court will refer to the fire(s) at issue as a single fire.

Department's (VFD) report, collected evidence, and interviewed the Plaintiff and her son. Though the house sustained smoke damage, the Plaintiff does not contest Nationwide's conclusion that the damage did not constitute a total loss and instead, the house was in such a condition would allow for remodeling. (P. Smith Second Stmt. 47–48.)

Hunter also determined that there were two separate fires in the house: one in the kitchen on the stovetop, where newspapers were stuffed underneath the grate of one of the gas burners; and one in the hallway, where there was an unusual burn pattern indicating the presence of an ignitable liquid trailer. (Hunter Report 7, ECF No. 51-2.) Hunter took samples of the carpet and pad from the hallway and laboratory testing confirmed that the ignitable liquid on one sample was gasoline residue. (*Id.* at 6.) Ultimately, Hunter opined that the cause of the two fires was "the result of an intentional human act[;] this is an incendiary fire." (*Id.* at 7.)

According to Nationwide, because it had reason to believe that the fire was intentionally set, the case was assigned to Christopher Lease of Nationwide's Special Investigations Unit (SIU) to determine who set the fire. Lease maintains that he examined the house, canvassed the neighborhood, and interviewed the Plaintiff and Carroll. (Lease Dep. 108:17–110:8, ECF No. 64-12.) From his interview of the Plaintiff, Lease noted that one month earlier, the Plaintiff's basement flooded due to a sewer backup and she had received $10,000 from Nationwide. From his examination of the house, Lease determined that although the Plaintiff cleaned her basement after the sewer backup, she did not have the damage repaired. (P. Smith Stmt. 8–9; Case Manager System (CMS) Notes 21–22, ECF No. 64-13.)

Lease also spoke with the Garrett VFD Chief and confirmed that the VFD found two separate fires in the house. (Lease Dep. 106:12–16; CMS Notes 21.) Though the VFD categorized the fire as still "under investigation," they did not investigate the fire because the

VFD did not have any certified fire investigators. (Lease Dep. 105:14–106:11; CMS Notes 21.) Lease did not talk to the firefighters who were at the scene of the fire, nor did he receive any photos from the VFD, though he requested photos on at least one occasion. (Lease Dep. 108:2–9.) The VFD Fire Marshal ultimately informed Lease that they were not interested in investigating the fire any further. (*Id.* at 263:2–12.) Lease also learned from the Garrett Police Department (PD) that Carroll had previously "vandaliz[ed] mailboxes." (*Id.* at 109:11–110:8.) During a recorded interview with Lease, the Plaintiff confirmed that Carroll had been caught vandalizing mailboxes and a golf course. (P. Smith Second Stmt. 12–13.)

During his interview with the Plaintiff, Lease disclosed that Hunter found two points of origin of the fire: the first emanating with the newspapers on the stove and the second due to the presence of gasoline in the hallway. (*Id.* at 38–39.) Lease then explained that the evidence "leads to Austin [Carroll]." (*Id.* at 40.) Though neither party contests the content of the interview, the parties have differing interpretations of the inferences resulting from Lease's statement in the following portions of the interview:

> I know you filed bankruptcy a couple of years ago and you're getting back on your feet and doing everything that you can. And I think you're doing the right thing. I think you're doing everything that you can.
>
> * * *
>
> You're working hard and you're paying your bills, and you're doing everything, um, Austin is too. It doesn't seem like Austin's a bad kid.
>
> * * *
>
> Um, so now, we have, I'm stuck in a situation, here, and, obviously, um, when law enforcement requests my information or my file . . . I have to turn it over. I have to turn it over. I have to turn it over to the State Fire Marshal's office, um, and, yeah, the department of insurance, National Insurance Crime Bureau and Garrett Fire Department or whomever, okay?
>
> No one has requested that, obviously. I wanted to take the opportunity to first meet with you.
>
> And try to figure out what is the best thing we can do okay? . . . [H]e's only 19 and, you know, you're, you're not too old yourself. I mean you've got a life too, I mean, um, in time you'd have quite a few grandchildren, probably.

(*Id.* at 40, 41, 43–44.)

He then asked the Plaintiff, "What do you want Nationwide to do?" and she replied "Like, figure out what happened." (*Id.* at 45.) Lease replied back, "I'm, okay, I'm certain as to what happened." (*Id.*) Lease informed the Plaintiff that if she wished to continue to pursue her claim, Nationwide would move forward with requests to obtain the Plaintiff's financial records and conduct an examination under oath (EUO) of both the Plaintiff and Carroll. (*Id.*) If the claim was denied, then Nationwide would have to report "everything" to the National Insurance Crime Bureau and the Indiana Department of Insurance, "[a]nd, then they follow up with any possible criminal charges." (*Id.* at 46.) Alternatively, Nationwide would conclude the investigation if she decided to no longer pursue her claim. (*Id.* ("[T]he other thing is, is if you withdrew your claim then I stop here.").)

The Plaintiff explained that she was "not gonna just let it go. I mean . . . I lost my house." (*Id.*) She also expressed doubts that Carroll burned the house down, stating "[W]hether anybody did come in or not I don't know. I wasn't there. . . . So it's possible that somebody did, I don't know. But you're trying to say Austin did it." (*Id.* at 47.) Lease affirmed, "[T]he evidence, certainly, points that way . . . ." (*Id.*) Lease explained that his canvassing of the neighborhood led him to the conclusion that the neighborhood was safe and Carroll told him that he did not have any enemies, so it was unlikely that someone broke in and started the fire. (*Id.* at 48). Lease also confirmed with the Plaintiff that there had been no threats or harassing phone calls against her. (*Id.*) The Plaintiff maintained that she believed Carroll could not have done it. (*Id.* ("[T]here's no way that he would want to lose his house.").) The interview concluded with Lease affirming that

as long as the Plaintiff wished to continue to pursue her claim, Nationwide would continue with the investigation and both the Plaintiff and Carroll would have to submit to EUOs.

Lease subsequently interviewed Carroll, who confirmed that there were newspapers near the stove, though Carroll stated he did not know how they got under the burner. (Carroll Second Stmt. 24, ECF No. 64-15.) Lease explained that the evidence indicated Carroll started the fire:

> Lease: And I know how much you love your mother.
> Carroll: Uh-huh.
> Lease: I mean, you'd probably do anything for you[r] mother.
> Carroll: Yeah.
> Lease: And I think she'd do anything for you.
> Carroll: Uh-huh.
> Lease: Right, and the reason I wanted to talk to you both, you know, both of you here today is because once this can, continues to grow then the Indiana State Fire Marshal might want my file, the Indiana Department of Insurance, National Insurance Crime Bureau, I don't know, anyone that requests my file I have to legally turn it over to them.
> Carroll: Yep.
> Lease: But we're not, we're not at that stage and no one's asked for my information, okay. I haven't even talked to the State Fire Marshal.
> Carroll: Okay.
> Lease: Okay? Um, and I just want to be clear that if, if you were, 'cause you seem just as, you seem like a good kid and you know, you know, and everything points to a bad choice of, you know, renovate the house, maybe, get a little bit of insurance money. . . .
>                  \* \* \*
> Lease: And then, I told her [the Plaintiff], I said, well, let me talk to Austin [Carroll] because if I talk to Austin and we can straighten this out then I don't have to go any further.
> Carroll: Yeah.
> Lease: I don't have to do anything. I don't have to talk to Indiana State Fire Marshal, the County Prosecutor, or anything of that nature, you know what I mean?
> Carroll: Yeah.
> Lease: Um, with that being said do you understand everything that I j-, I've explained to you?
> Carroll: Yep.
> Lease: Okay.
> Carroll: I'm just, I know I didn't do it, so, it's, like, freaking me out 'cause somebody tried killing me.
> Lease: Okay. You had nothing . . .

> Carroll: No [cries].
> Lease: Nothing at all to do with this?
> Carroll: Nope.

(*Id.* at 26–28.) Lease told Carroll that the fire appeared intentional because someone took time to place newspapers underneath the burners and pour gasoline in the hallway. (*Id.* at 28–29.) Carroll again denied starting the fire, *Id.* at 29 ("I swear I did not do anything . . . ."), and affirmed to Lease that he and his mother would be willing to take a polygraph test. (*Id.*)

Ultimately, various Nationwide employees, as well as Lease, decided to deny the Plaintiff's claim. Nationwide sent the Plaintiff a denial letter [ECF No. 64-10] and Lease reported her claim to National Insurance Crime Bureau. (Lease Dep. 83:21–24; Corp. Rep. Dep. 30:8–17, ECF No. 69-25.) No one from Nationwide ever communicated with any prosecutor or any law enforcement agency. (Corp. Rep. Dep. 31:5–15, 51:9–20.)

## B. The Plaintiff's Financial Situation

Nationwide also learned about the Plaintiff's financial situation. The Plaintiff had filed for bankruptcy two years before the fire, had one medical bill as outstanding, and had about $200 in her checking account and no savings. (Smith Second Stmt. 5, 15, 25.) She also stated that from the $10,000 Nationwide provided her for the damage to her basement, she spent half of it on cleaning supplies and equipment, and had the other half on her person, in cash, when she went to Indianapolis the night of the fire. (*Id.* at 16–18; 24–26.) She maintained she was going to eventually use that money to repair the basement. (*Id.*) Additionally, during her EUO, she testified that, at the time of the fire, her expenses exceeded her income. (Smith EUO 15:13–15, ECF No. 64-23.)

Moreover, the Plaintiff submitted her Sworn Proof of Loss form, after its deadline, claiming $159,000 in losses. (Sworn Proof of Loss, ECF No. 64-8.) Nationwide maintains that the Plaintiff did not provide the necessary documentation to support that figure and accordingly, Nationwide required her to resubmit the proof of loss. Following the EUOs, the Plaintiff's attorney eventually provided Nationwide with the required financial documents. (CMS Notes 5.) From its review of the Plaintiff's supporting documentation, Nationwide learned that she had $100 in overdraft fees in the months leading up to the fire, and about $1,000 left in her bank account. (P. Bank Records 3, 7, 9, ECF No. 64-26.) Additionally, the Plaintiff had caught up with her mortgage payments only about 24 hours before the fire. (*Id.*)

Throughout its investigation, Nationwide advanced money to the Plaintiff for the living expenses, incidentals, and mileage for her and her family, paid for a company to secure long-term housing for her and her family, and financed long-term housing for them. (Check Listing, ECF No. 64-3.) In total, Nationwide's payments from the date of the fire (April 4, 2014) through one month after her claim was denied (December 4, 2014) totaled over $56,000: Nationwide paid $26,833.87 on housing for the Plaintiff and her family, advanced her $3,525.84 for their additional living expenses, spent $9,367.26 to clean the clothing and other contents of their house, and paid $16,276.07 to pack and store the contents of the house in a storage unit. (*Id.*)

The day after Nationwide stopped paying for the Plaintiff's housing, she filed this lawsuit against Nationwide alleging: (1) breach of contract, arising from Nationwide's denial of coverage for the claim under the Policy, and (2) bad faith, purportedly arising from Nationwide's: (a) handling of the claim and (b) ultimate decision to deny the claim. (Compl. ¶¶ 7–15, ECF No. 3.)

On January 27, 2017, Nationwide filed a Motion for Partial Summary Judgment [ECF No. 63] as to the Plaintiff's bad faith claim (Count II), along with a Memorandum in Support [ECF No. 65] and several exhibits [ECF Nos. 64-1 to 64-27]. The Plaintiff filed a Response [ECF No. 68] on March 24, 2017, along with several exhibits [ECF Nos. 69-1 to 69-32];[2] and Nationwide filed a Reply on April 19, 2017 [ECF No. 74], along with several exhibits [ECF Nos. 75-1 to 75-3]. The Motion for Partial Summary Judgment is fully briefed and ripe for ruling.[3]

## STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the nonmoving party is

---

[2]    The Plaintiff appears to ask for judgment as a matter of law that Nationwide acted in bad faith. (*See* Pl. Resp. Br. 2, ECF No. 68.) However, the proper procedure for moving for judgment as a matter of law, pursuant to the local rules for this Judicial District, is to file a separate motion. *See* N.D. Ind. L.R 7-1 ("Motions must be filed separately.").

[3]    Also before the Court is a Motion to Strike [ECF No. 76] the Defendant's Second Appendix, [ECF Nos. 75-1 to 75-3], filed by the Plaintiff on April 19, 2017. On April 24, 2017, the Defendant submitted a Response [ECF No. 77], and on April 30, 2017, the Plaintiff filed a Reply [ECF No. 78]. On May 15, 2017, the Court granted [ECF No. 80] Nationwide's Motion for Leave to File the attached Surreply [ECF No. 79-1] in Support of her Motion to Strike.
    The Plaintiff argues that the referenced exhibits—which were attached to the Defendant's Reply—were improperly filed. The Plaintiff maintains that though she consented to an extension of time for the filing of Nationwide's Reply brief, she did not consent to the submission of additional evidentiary materials. Moreover, she claims that Local Rule 56-1(c) does not state that a moving party can file supporting materials to their reply brief. Ultimately, the Plaintiff argues that "[t]he summary judgment procedure . . . gives the non-moving party only one chance to designate evidence" and it would be unjust to the Plaintiff to allow the Defendant another opportunity to designate evidence. (Mot. to Strike 2, ECF No. 76). The Defendant argues that the Plaintiff misinterprets the procedure because the Court has wide discretion to allow parties to amend or supplement evidence, citing Seventh Circuit precedent in which a motion to strike supplemental materials file in support of a reply brief was denied. (Resp. to Mot. to Strike 2, ECF No.  77 (citing *Beck v. Univ. of Wisc. Bd. Of Regents*, 75 F.3d 1130, 1134 n.1 (7th Cir. 1996).)
    Because the Court did not rely upon the materials in Nationwide's Second Appendix, the Court denies the Plaintiff's Motion to Strike as moot.

required to marshal and present the Court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court should only deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (first citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010), then citing *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. [A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## DISCUSSION

Nationwide requests partial summary judgment only on the Plaintiff's bad faith claim (Count II), which the Plaintiff alleges arises from Nationwide's: (a) ultimate decision to deny the claim and (b) its handling of the claim, including its investigation. In its Motion, Nationwide argues that the Plaintiff's bad faith claim fails as a matter of law because: (a) a reasonable jury

would find that it had a rational, principled basis for denying coverage and (b) Indiana does not recognize a bad faith claim on the basis of claims handling. Even if the Court finds that a cause of action exists for bad faith claim handling, Nationwide asserts it acted in good faith while handling the Plaintiff's claim. The Court will examine each of these arguments.

## A.      Denial of Coverage

In Indiana, an insurance company can be found liable in tort for a bad faith denial of payment on an insurance claim. *Lummis v. State Farm Fire & Cas. Co.*, No. 1:04-CV-008, 2005 WL 1417053, at *6 (S.D. Ind. June 16, 2005); *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993). To prove bad faith denial, the insured must establish that the insurer denied liability "knowing there is no rational, principled basis for doing so." *Lummis*, 2005 WL 1417053, at *6 (citing *Woodley v. Fields*, 819 N.E.2d 123, 133 (Ind. App. 2004)). In other words, to infer bad faith, there must be an "absence of any reasonable ground" for the denial of payment. *Hoosier Ins. Co. v. Mangino*, 419 N.E.2d 978, 983 (Ind. App. 1981). "Poor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present." *Woodley*, 819 N.E.2d at 133 (citing *Colley v. Ind. Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998). This inquiry is distinct from what Nationwide will have to provide to defeat the Plaintiff's breach of contract claim. As the Court explained in *Lummis*:

> To defeat the breach claim, [the defendant] will have to prove that [the plaintiff] *in fact* caused or procured the fire. That question is not at issue [in] this motion. For even if it turned out that [the defendant] was wrong in its basis for denying the claim and thus was in breach of the insurance contract—a question on which the Court states no opinion—[the defendant] could still be found not liable on the bad faith claim if there was a legitimate, albeit incorrect, basis for believing that [the plaintiff] caused or procured the fire.

*Lummis*, 2005 WL 1417053, at *6; *see also Dean v. Ins. Co. of N. Am.*, 453 N.E.2d 1187, 1194 (Ind. Ct. App. 1983).

The Plaintiff also seeks punitive damages in this case. "[T]he initial inquiry is whether [the] plaintiff[] [has] raised a genuine issue of fact as to whether a tort has been committed. 'Only after it is determined that a tort has been committed is the question of punitive damages breached.'" *Lummis*, 2005 WL 1417053, at *6 (citing *Colley*, 691 N.E.2d at 1261 n.2). This is because in Indiana, "the mere finding by a preponderance of the evidence that the insurer committed the tort will not, standing alone, justify the imposition of punitive damages." *Id.* (citing *Erie*, 622 N.E.2d at 520). Punitive damages on a bad faith claim require "clear and convincing evidence that the insurer knew there was no legitimate basis for the denial." *Friedline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002); *Erie*, 622 N.E.2d at 520; *see also McLaughlin v. State Farm Mut. Ins. Co.*, 30 F.2d 861, 870 (7th Cir. 1994) (reversing jury award of punitive damages where evidence of bad faith was insufficient to meet clear and convincing standard of proof, but noting that "[t]he jury could, on the other hand, have found that the denial of coverage was unreasonable and therefore tortious").

Accordingly, the first issue on this pending Motion is whether a reasonable juror could find by a preponderance of the evidence that Nationwide denied coverage to the Plaintiff with knowledge that it lacked any reasonable ground for the denial. *Lummis*, 2005 WL 1417053, at *7 ("To infer bad faith for an insurer's denial of payment on a claim, there must be an absence of any reasonable ground for the denial.") (internal quotation marks and citation omitted). "Circumstantial evidence of arson can provide reasonable grounds for denying a claim." *Id.* (citing *Mangino*, 419 N.E.2d at 986–87). Thus, "[c]ircumstantial evidence that the fire was intentionally set and that the insured has both a motive and opportunity to set or procure a fire

can support an inference of arson by the insured." *Id.*; *Cincinnati Ins. Co. v. Compton*, 569 N.E.2d 728, 729–30 (Ind. Ct. App. 1991); *Dean*, 453 N.E.2d at 1194–95.

In this case, Nationwide determined that the fire was intentionally set, the Plaintiff had the financial motive to procure the fire, and the Plaintiff had the opportunity, with Carroll's help, to set the fire. As a result, Nationwide argues that it had a rational, principled basis to deny the Plaintiff's claim. In particular, Nationwide maintains that the following facts supporting its basis for denial of the claim:

- There were newspapers stuffed underneath one of the burners in the kitchen, and the hallway tested positive for the presence of gasoline on the carpet, thus indicating that the fire was intentional.

- Jim Hunter, a certified cause-and-origin investigator, determined that the fire was intentional.

- The Plaintiff's monthly expenses exceeded her income, she had a pending overdraft fee, and she had $200 in her checking account and no savings.

- The Plaintiff had been behind on her mortgage for at least five months prior to the fire, but she brought it current less than 24 hours before the fire.

- The Plaintiff previously received $10,000 from Nationwide for damage resulting from flooding to her basement, but she did not use the money to repair her basement.

- The Plaintiff took $5,000 in cash and kept it on her person the day of the fire.

- The house was in poor condition and thus, it did not appear that the Plaintiff demonstrated care towards it.

- The amount the Plaintiff claimed in her Sworn Proof of Loss was greater than the amount she valued her property and assets when filing for bankruptcy two years prior to the fire.

- Carroll had a history of vandalizing property.

- Carroll was the only individual in the home, along with the dogs that "everyone is scared of." (Carroll Second Stmt. 6). Thus, it was unlikely an intruder broke into the house.

- The Plaintiff and Carroll affirmed that they have no enemies and never received threatening phone calls.

- The fire happened 12 hours after the Plaintiff took her other children on an overnight trip.

The Plaintiff agrees that the dispute "is whether it was rational and principled for Nationwide to take that position" that the fire was caused by the Plaintiff's act of arson."[4] (Pl. Resp. Br. 22). However, the Plaintiff argues that Nationwide's ultimate decision to deny her claim was not rational and principled, but rather, "[i]t was wholly irrational and unprincipled for Nationwide to deny Smith's claim because Nationwide knew—all along—that [the cause of the fire was not arson by the Plaintiff]." (*Id.*) In support, the Plaintiff provides reasons including:

- The Plaintiff and Carroll repeatedly denied involvement in the fire and were willing to take a polygraph test to prove their position;

- Carroll himself discovered the fire and called 911;

- Important papers and family pets were in the house when the fire started, therefore it is unlikely the Plaintiff conspired to destroy her own valuables;

---

[4]     The Plaintiff adds that the issue is also "whether the Smith fire was an arson fire." (*Id.*) Though the Plaintiff does not otherwise argue that Nationwide must prove the cause-in-fact of the fire, to ensure consideration of any potential argument, the Court holds that demonstrating whether the Plaintiff's act of arson was the cause-in-fact of the fire is not at issue in this Motion for Partial Summary Judgment. The Motion is instead constricted to the bad faith claim. Thus, the relevant inquiry is whether Nationwide's denial of the Plaintiff's claim based on its determination that the fire was arson caused by the Plaintiff was rational and principled. *See Lummis*, 2005 WL 1417053, at *6, *9. In other words, for the purposes of this Motion, the cause-in-fact of the fire is not at issue, but rather whether Nationwide's eventual denial of the Plaintiff's claim was rational. *Id.*

- Neither Nationwide nor Jim Hunter reviewed the fire department's photographs which show there was only a single fire;

- The Garrett VFD determined the fire was not suspicious;

- Lease used scare tactics and misrepresentations to try to get the Plaintiff to drop her claim;

- Nationwide did not refer the matter to a prosecutor, as it is obligated to do under Indiana law after making an arson determination; and

- The Plaintiff's expert witness, Charles Miller, has opined that Nationwide did not reasonably weigh the evidence.

Accordingly, the Plaintiff claims that Nationwide "manufacture[d] a reason to deny [the] Plaintiff's claim." (*Id.* at 2.)

The Court holds that Nationwide has demonstrated, on the basis of facts that are not subject to genuine dispute, that it had a rational, principled reason to deny the Plaintiff's claim on the basis of its determination that the fire was intentional, that the Plaintiff had the financial motive to set the fire, and that the Plaintiff had the opportunity, with Carroll, to set the fire.

First, Nationwide articulated a rational, principled basis for why it believed the fire was intentional—it relied upon the Report of a veteran cause-and-origin investigator who detailed why he believed the fire to be intentional, including newspapers under the burner and gasoline in the hallway. Second, Nationwide has shown a rational, principled basis to conclude that the Plaintiff had the financial motive to set the fire by determining that the Plaintiff was in a grim financial situation and paid off her mortgage less than 24 hours before the fire. *See Clifford v. State Farm Fire & Cas. Ins. Co.*, No. 3:10-CV-221, 2011 WL 2326969 at *18–19 (N.D. Ind. June 7, 2011) (holding that the insurer had a rational and principled basis to deny the claim

because the plaintiff had the potential of a financial benefit from recovering under the policy, was behind on payments, and caught up with premiums five days before the fire). Finally, Nationwide has established a rational, principled basis to conclude that the Plaintiff, with Carroll, had an opportunity to set the fire because he was the only individual at home, the house did not show signs of a break in, and neither the Plaintiff nor Carroll were threatened prior to the fire. *Sexson v. State Farm Fire & Cas. Co.*, 61 F. App'x 267, 271 (7th Cir. 2003) (dismissing a bad-faith claim because the insurer presented evidence that the insured had opportunity to set the fire because insured had the key to the house and was the last person to leave the house).

Though the Plaintiff argues that Nationwide incorrectly interpreted these facts, and instead the facts "support alternative inferences from those Nationwide" drew, that is not the correct standard. An insurer's "reading of the evidence does not have to be accurate, it just cannot be irrational." *Clifford*, 2011 WL 2326969, at *19. Nationwide has demonstrated that it reviewed the facts, rationally weighed them, and made a principled decision. Additionally, Nationwide did not deny the Plaintiff's claim with "a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Colley*, 691 N.E.2d at 1261. Notably, because the Plaintiff does not contest the facts themselves, there are no genuine issues of material fact preventing a grant of summary judgment. The Court finds that there is no "evidence from which a reasonable jury could conclude that [the insurer] lacked a rational, principled basis for [denying the Plaintiff's] claim . . . so her bad faith claim cannot survive summary judgment." *Id.* In fact, the Plaintiff does not contest her financial motive or Nationwide's determination that she had the opportunity, through Carroll, to set the fire. Rather, the Plaintiff disputes that Nationwide's conclusions that: (1) the fire was intentional and (2) if it was intentional, that she was the one involved in setting the fire.

## 1.     Nationwide Had a Rational Basis to Determine the Fire was Intentional

The Plaintiff's counterarguments regarding whether the fire was intentional center on her dispute with Nationwide's reliance on Hunter's Report and Lease's investigation, both of which concluded that the fire was intentionally set. The Plaintiff alleges that Nationwide was aware that Hunter's Report and Lease's investigation were flawed in their conclusions and nevertheless relied upon them to support its denial of the Plaintiff's claim.

In support of her argument that Hunter's Report and Lease's investigation were flawed, the Plaintiff argues that both Hunter and Lease purposefully ignored the Garrett VFD's determination that there was nothing suspicious about the fire. In this manner, the Plaintiff contests the application of *Lummis* to her case by arguing that the fire department determined the fires were intentionally set in *Lummis*. Here, however, the Garrett VFD made no such finding; the VFD "did not believe the fire was suspicious," and identified only one fire. (Pl. Resp. Br. 21, 24 (citing Claim Log 14, ECF No. 69-3; Chief Werkheiser's Decl., ECF No. 69-29; VFD Report, ECF No. 69-31 ("interior crews located a small fire in the kitchen + hallway area")).)

Though the Plaintiff is correct that Chief Werkheiser "did not observe anything suspicious about the fire," and only physically saw one fire, Werkheiser made no conclusion regarding the cause-and-origin of the fire. (Werkheiser Decl. ¶ 7.) In fact, Werkheiser explained that he is not a certified fire investigator, "nor is any other Garrett Firefighter." (*Id.* at ¶ 8.) Accordingly, Nationwide had a rational, principled basis for determining that the Garrett VFD's Report was not an expert opinion regarding the cause-and-origin of the fire. Hunter, who is a certified fire investigator, provided a reasoned explanation regarding how he determined that the fire had two points of origin and appeared to be intentional—he found newspapers stuffed under the grate of one of the kitchen burners, he smelled gasoline in the hallway, saw a burn pattern

typical to that of using an ignitable liquid, and samples from the hallway tested positive for

gasoline. (*See* Hunter Report 4–6.) Therefore, Nationwide had a rational, principled basis for

relying on Hunter's expert opinion. *See Thompson Hardwoods, Inc. v. Transp. Co.*, No. NA

0074CHK, 2002 WL 440222, at *5 (S.D. Ind. Mar. 15, 2002) (it is rational for the insurer to rely

upon an expert "for purposes of the bad faith claim, . . . so long as [the expert] could offer . .  a

reasoned explanation for his opinion").

Accordingly, although the VFD made no finding on the cause-and-origin of the fire, this

does not mean Nationwide acted in bad faith when making its own determination regarding the

cause-and-origin of the fire. The rationale in *Lummis* is still applicable: "To prevail on their bad

faith claim, the [Plaintiff] must show the absence of any reasonable ground for [the Defendant's]

denial of payment on the [Plaintiff's] policy. They would also have to show conscious

wrongdoing by [the Defendant]." 2005 WL 1417053, at *9 (internal citations and quotation

marks omitted). In the case at hand, the Plaintiff cannot demonstrate the absence of any

reasonable ground for Nationwide's denial, nor is there any evidence that Nationwide engaged in

"conscious wrongdoing."

Moreover, the Court finds that the Plaintiff's argument contesting whether there were two

fires is immaterial because the issue is not the number of fires, but whether it was irrational for

Nationwide to conclude that the fire was intentionally set. In other words, the intentionality of

setting the fire, as opposed to the number of fires, is the root of the dispute. Even if Nationwide

incorrectly determined that there were two fires, which the Plaintiff argues evidences

Nationwide's carelessness and bad faith, an insurer's "reading of the evidence does not have to

be accurate, it just cannot be irrational." *Clifford*, 2011 WL 2326969, at *19. Here, Nationwide

has rationally explained how it concluded that there were two separate origin points for the fire and that it was intentionally set.

Additionally, the Indiana Supreme Court has held that "the lack of a diligent investigation alone is not sufficient to support an award" of bad faith. *Erie,* 622 N.E.2d at 520. Thus, even if it is true that Lease and Hunter should have interviewed the firemen who were at the scene of the fire and should have tried harder to obtain the VFD's photographs, this lack of diligent investigation does not amount to an element of culpability. *Id.* ("A bad faith determination inherently includes an element of culpability.").

2. ***Nationwide Had a Rational Basis to Determine the Plaintiff was Responsible for Intentionally Setting the Fire***

The Plaintiff argues that even if Nationwide rationally concluded that the fire was intentional, Nationwide acted in bad faith when concluding that the Plaintiff and Carroll were the cause of the fire. In support, the Plaintiff argues that she and Carroll continue to maintain they did not start the fire, Carroll himself called 911, family pets were in the house at the time of the fire, and the Plaintiff's important papers and/or personal effects were destroyed during the fire. Though these arguments may serve as support for the Plaintiff in her breach of contract claim, where the cause-in-fact of the fire is at issue, these facts do not demonstrate that Nationwide was irrational and unprincipled when weighing all of the facts, both for and against the Plaintiff, concluding that the evidence shows the Plaintiff was responsible for the fire, and denying the Plaintiff's claim. In *Lummis*, the plaintiffs' similarly argued that they lost irreplaceable property in the fire and they consistently maintained they did not start the fire. *Lummis*, 2005 WL 1417053, at *9. The *Lummis* court held that:

> This evidence may be highly relevant in deciding whether [the defendant] was wrong in determining that [the plaintiff] procured the fire, so that it breached its contact with [the plaintiff]. But, the possibility that a jury could disagree with [the defendant's] determination will not defeat summary judgment on a bad faith claim. For purposes of this motion, the question on [the plaintiff's] bad faith claim is whether a juror could find by a preponderance of the evidence that [the defendant] *knew* it had no rational, principled basis for suspecting that Lummis procured the fire."

*Id.*

The Plaintiff further alleges that Nationwide did not have a rational, principled basis to determine that she caused the fire because Nationwide had already "made up [its] mind that the fire was caused by arson" and thus, "manufacture[d] a reason to deny [the] Plaintiff's claim." (Pl. Resp. Br. 2, 10.) In support of this contention, the Plaintiff claims that Nationwide rejected the Plaintiff's Sworn Proof of Loss estimate for no reason. However, the Plaintiff provides no basis why Nationwide's explanation for rejecting the Sworn Proof of Loss—that the Plaintiff submitted her the estimate without the necessary paperwork to back up her claim—is irrational. Similarly, the Plaintiff contends that Nationwide's decision to pay for the Plaintiff's housing and other incidentals, but failure to subsequently "demand[] reimbursement" is evidence that "Nationwide does not believe its stated reason [arson] for denying [the Plaintiff's] claim." (Pl. Resp. Br. 11.) The Plaintiff's argument again suffers from the same flawed logical leap—the Plaintiff cites to no evidence connecting Nationwide's payments to the Plaintiff for her housing and incidentals as based upon Nationwide's alleged belief that the fire was not caused by arson.

Furthermore, the Plaintiff argues that Nationwide's actions of failing to notify the authorities of the suspected arson and to turn over its files also establishes that Nationwide did not believe the fire was caused by arson. Though it does not appear that Nationwide turned over its files to the authorities, Nationwide reported its conclusion that the fire resulted from arson

committed by the Plaintiff to the Indiana State Fire Marshal and the National Insurance Crime

Bureau. (CMS Notes 21 ("Told [Chief Werkheiser] that . . . the fire(s) were set and an accelerant

was used. He said he would call Indiana SFM [State Fire Marshal] . . . .").) The Plaintiff also

does not contest that Lease spoke to the Fire Marshal. Although Nationwide did not turn over its

files, Nationwide provides a rational explanation for why it did not do so—the fire department

told Lease it did not want to investigate the fire. Of course, Nationwide could have established a

more thorough record of reporting the claim to the authorities and/or prosecutor. However, that

Nationwide did not do so does not rise to the level of a bad faith claim denial, especially since

Nationwide did alert the fire department and the National Insurance Crime Bureau.[5]

## B.     Claims Handling

The Plaintiff additionally alleges that Nationwide acted in bad faith in its investigation

and "handling of the claim." (Compl. ¶ 14). Though the Plaintiff incorporates many of the same

arguments she made earlier, which the Court has already addressed, the crux of the Plaintiff's

argument rests on the Plaintiff's allegations that Lease's actions, and in particular, his interviews

of the Plaintiff and Carroll, evidence bad faith.

Before turning to the substance of the arguments, the Court looks first to the contention

raised by Nationwide—that Indiana does not recognize a bad faith claim on the basis of "claims

handling." Nationwide points to the holding in *Monroe Guaranty Insurance Co. v. Magwerks*

*Co.*, in which the Indiana Supreme Court analyzed the plaintiff's argument that "the duty to deal

---

[5]        The Court rejects the opinions offered by the Plaintiff's expert witness, Charles Miller, for
purposes of this Motion. Miller does not provide facts supporting his opinion, but offers only conclusory
opinions. *See Krieg v. Progress W. Ins. Co.*, No. C049109, 2006 WL 895100, at * 7 (Cal. Ct. App. Apr. 7,
2006) ("An expert's conclusory opinions regarding the reasonableness of an insurer's conduct are
insufficient to establish a triable issue of fact on that question.").

in good faith includes also the manner of handling the claim." 829 N.E.2d 968, 976 (Ind. 2005). There, the court held, "[W]e decline at this time to expand on the extent of the duty an insurer owes to its injured beyond those we have already expressed in [*Erie*]." *Id.* In *Erie*, the Indiana Supreme Court detailed the following as falling under the duty to act in good faith: "(1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into settlement of his claim." 622 N.E.2d at 519. Accordingly, the *Magwerks* court went on to analyze the bad faith claims handling claim under the applicable prongs of *Erie*. In other words, the *Magwerks* court held that there is no cause of action for bad faith claims handling, but the allegations of bad faith claims handling may include elements of deceiving the insured, for example, and a court can analyze claims pursuant to these prongs of *Erie.*

In *Klepper v. Ace American Insurance Co.*, the Indiana Court of Appeals was confronted with the same issue and affirmed *Magwerks*, holding in a footnote that the plaintiff's argument suffered from the same defect as the plaintiff's argument in *Magwerks*: "Likewise, . . . the [plaintiff] has not developed an argument for expanding the scope of an insurer's duty to deal in good faith beyond that described in [*Erie*] . . . ." 999 N.E.2d 86, 98 n.11 (Ind. Ct. App. 2013). Accordingly, Nationwide maintains that Indiana has refused to recognize a bad-faith claim based on an insurer's claim handling practices.

Recently, two cases summarized the analysis in *Magwerks* and its progeny. In *Dennerline v. ProNational Insurance Co.*, the court held, "Contrary to [insureds'] assertion, the Court was not confused about the Indiana Supreme Court's decision [in *Magwerks*]. The Indiana Supreme Court has not recognized bad faith handling of a claim or expanded the obligations that it set forth in [*Erie*]." No. 1:05-CV-LJM, 2006 WL 1344059, at * 2 (S.D. Ind. May 16, 2006). The

court in *Telamon Corp. v. Charter Oak Fire Insurance Co.* was similarly faced with an allegation that an insurer handled a claim in bad faith. The *Telamon* court held that "neither the Indiana Supreme Court nor the Indiana Court of Appeals has recognized a claim for bad faith claims handling. Thus, in accordance with *Magwerks*, the court will analyze Telamon's claim under the four obligations articulated in [*Erie*]." 179 F. Supp. 3d 851, 856 (S.D. Ind. 2016). Accordingly, though the *Magwerks* court rejected the bad faith handling claim, the *Magwerks* court then analyzed the insured's bad faith claim under the *Erie* obligations as laid out above. The *Telamon* court followed the same approach, and accordingly this Court does the same.

Here, the Plaintiff's allegation concerning Nationwide's claims handling practice is essentially a claim that Nationwide deceived the Plaintiff and also exercised an unfair advantage to pressure the Plaintiff into settlement of her claim. The bulk of the Plaintiff's support for this is her argument that during her interview with Lease, he "made thinly-veiled, obvious threats that if [she] did not drop her claim then Nationwide would be forced to see to it that Austin, her son, would be criminally prosecuted and jailed." (Pl. Resp. Br. 2.)

In particular, the Plaintiff points out that Lease told the Plaintiff, "When law enforcement requests my information or my file . . . I have to turn it over" "[a]nd, then they follow up with any possible criminal charges." (Smith Second Smnt. 46.) "[T]he other thing is, is if you withdrew your claim then I stop here." (*Id.*) The Plaintiff establishes that this is a misstatement of Indiana law because Indiana law requires that an insurer notify the authorities via written notice if the insurer suspects arson. "There is no provision in the statute that says Nationwide can wait and see if the insured withdraws her claim before the duty to report arises. Accordingly, as soon as Nationwide had 'reason to believe' there was arson, it was duty bound by Indiana law to report that arson to the proper law enforcement authorities *and* provide its file to them." (Pl.

Resp. Br. 15). Therefore, the Plaintiff maintains that Lease lied to her about Nationwide's legal requirements for when to turn over his file because Nationwide did not believe the fire was caused by arson.

The Plaintiff further argues that Lease lied to the Plaintiff when he told her that he was "certain" as to what happened the night of the fire, even though Lease had not officially determined who caused the fire because Nationwide's investigation was not complete. (Smith Second Stmt. 45.) As additional evidence of Lease's tactics, the Plaintiff points out that during his deposition, Lease stated that he had to comply with the duty of good faith "for the most part" and depending "on the circumstances." (Lease Dep. 66:12–24.)

Nationwide argues that the Plaintiff's allegations of threats by Lease are false, especially because the Plaintiff did not report these threats to anyone, including her attorney. Moreover, Nationwide maintains that Lease was relaying to the Plaintiff the status of the investigation, as an insurer is obligated to do, and was not threatening the Plaintiff. Nationwide argues that Lease:

> was confronted with two intentionally set fires that happened when Smith's then 19-year-old son Carroll—who has a history of destroying property—was home alone. Faced with these facts, Lease's decision to speak with [the Plaintiff] first to provide her the opportunity to weigh her options and make an informed decision about whether to pursue her claim cannot reasonably be construed as evidence of bad faith.

(Def.'s Reply Br. 10, ECF No. 74).

It appears that Lease informed the Plaintiff about the findings of Nationwide's investigation and then questioned her about whether she was involved in the fire, as he had grounds to do based upon the evidence available to him. In fact, as Nationwide argues, an insurer acts in bad faith when consciously concealing the results of its cause-and-origin investigation. *See Colley*, 691 N.E.2d at 1260 ("[T]he Colleys contend that Indiana Farmers handled their

insurance claim in bad faith by concealing its arson investigation."); *see also Clifford*, 2011 WL 2326969, at *14 ("Evidence that an insurer told an insured's acquaintances that he committed arson does not show that it used unfair pressure against him."). Lease then informed the Plaintiff that she would likely have to undergo EUOs. This does not constitute bad faith—though the Plaintiff may perceive EUOs as onerous and difficult, it is not bad faith for an insurer to tell an insured that pursuit of their claim will be time consuming and/or difficult. *See Eli Lilly & Co. v. Zurich Am. Ins. Co*., 405 F. Supp. 2d 948, 958 (S.D. Ind. 2005) ("Lilly does assert that Zurich made attempts to dissuade Lilly from pursuing the coverage issue in litigation, but it did so only by reminding Lilly that litigation would be costly and time consuming, both of which are of course true. In sum, we find no evidence to support a finding of bad faith . . . on these claims.").

Even though Lease's interview technique may have been arguably accusatory, it does not rise to the level of conscious wrongdoing required for a finding of bad faith. *Colley*, 691 N.E.2d at 1261 ("Poor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present."). Furthermore, although Lease misrepresented the law when he incorrectly suggested that he would not have to report the arson if the Plaintiff withdrew her claim, Lease did inform the Plaintiff that he would have to turn over his materials and findings if asked by the authorities. His misstatement of law, even if considered careless, does not evidence the requisite level of bad faith. *Lilly*, 405 F. Supp. 2d at 958 ("Lilly suggests that Zurich acted in bad faith because it failed to properly investigate and apply Indiana law. However, an inadequate investigation or flawed interpretation of Indiana law does not constitute bad faith."). Therefore, Plaintiff's reliance upon *Liberty Mutual Insurance Co. v. Parkinson* is inapplicable here—in *Liberty*, the insured was "given incorrect information regarding her coverage" and was "actively dissuaded from filing a claim that was clearly covered under her

policy." 487 N.E.2d 162, 164 (Ind. Ct. App. 1985). Here, there is no evidence that Nationwide or Lease purposefully or maliciously provided incorrect information to the Plaintiff regarding her policy's coverage.

In sum, even after analyzing the Plaintiff's claim pursuant to the parameters in *Erie*, Nationwide's conduct does not rise to the level of bad faith. Among its other actions, Nationwide met with the Plaintiff and began its investigation as soon as the claim was filed, advanced her money for her necessary expenses, investigated for six months after receiving a cause-and-origin report that the fire was caused by arson, paid for the Plaintiff's expenses for one month after denying the claim, and had a rational basis to conclude that the Plaintiff caused the arson because newspapers were stuffed under the kitchen burner and gasoline was present in the hallway. Nationwide's investigation was not required to be perfect, and there is no evidence from which a jury could find that Nationwide committed conscious wrongdoing.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Defendant's Motion for Partial Summary Judgment [ECF No. 63] and DISMISSES Count II of the Plaintiff's Complaint. The Court accordingly DENIES the Plaintiff's request for punitive damages. Finally, the Court DENIES the Plaintiff's Motion to Strike the Defendant's Appendix [ECF No. 76] as moot.


SO ORDERED on August 28, 2017.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT